UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 4:17-CR00234 RLW/DDN |
| ) | |
| v. ) | |
| ) | |
| HISHAM MUTAN (3), ) | |
| ) | |
| Defendants. ) | |

### DEFENDANT HISHAM MUTAN'S MOTION TO SUPPRESS ANY AND ALL INTERCEPTED WIRE AND ELECTRONIC COMMUNICATIONS

COMES NOW Defendant Hisham Mutan, by and through his undersigned counsel and moves this Court to suppress all evidence derived from and obtained as a result of the government's interception of wire and electronic communications. In support of this motion, Defendant states as follows:

### Introduction

1. On or about December, 2016, the Department of Homeland Security (DHS), Homeland Security Investigations (HIS), and the Internal Revenue Service Criminal Investigation Division (IRS-CID) began a joint investigation into contraband cigarettes trafficking organization (CTO) allegedly being conducted in the Eastern District of Missouri.

2. On March 16, 2017, the Government filed an application for initial interception of wire and electronic communications, including but not limited to, text messages, to and from the cellular telephone bearing number (314) 665-6684 **(target telephone #6)** utilized by Hisham Mutan.

3.      On March 16, 2017, the Government submitted an application for the continuing interception of wire and electronic communications as to **target telephone #6,** subscribed to and utilized by Hisham Mutan. The United States District Court Judge John A. Ross authorized the continued interception of wire and electronic communications as to **target telephone #6** on that same date.

4.      On March 27, 2017, the Government submitted an application for the continued interception of wire and electronic communications as to **target telephone #6**. The United States District Court Judge John A. Ross signed an order authorizing the requested interceptions on that same date.

5.      On April 15, 2017, the Government submitted an application for the continued interception of wire and electronic communications as to **target telephone #6.** The United States District Court Judge Catherine Perry signed an order authorizing the requested interceptions that same date.

**Standing**

6.      Under 18 U.S.C. § 2518(10(a), "any aggrieved person" may move to suppress the contents of any wire or oral communication intercepted, or evidence derived therefrom, on the grounds that "(i) the communication was unlawfully intercepted; (ii) the order, authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was note made in conformity with the order or authorization or approval."

7.      An "aggrieved person" is defined as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11); *Alderman v. United States,* 394 U.S. 165, 171-80 (1969).

8.       Defendant Hisham Mutan is an "aggrieved person" under the governing statute because he was a party to intercepted telephone communication and a person against whom the interception was directed.

**Initial and Subsequent Applications/Affidavit for Wiretap Interceptions
Are Insufficient to Meet Necessity Requirement**

9.       Before a judge may enter an *ex parte* order authorizing or approving the interception of wire, oral or electronic communications, he or she must make a determination that based on the facts submitted by the applicant, "normal investigative procedures have been tried and have failed, or reasonably appear unlikely to succeed if tried, or to be too dangerous." 18 U.S.C. § 2518(3)(c).

10.      The purpose of the "necessity requirement" is to insure that a wiretap is "not to be routinely employed as the initial step in a criminal investigation." *United States vs. Giordano,* 416 U.S. 505, 515 (1974).

11.      When traditional investigative techniques would suffice to expose the crime, wiretapping is not to be used. *United States v. Kahn,* 415 U.S. 143, 153 N. 12 (1974). "Whether the statutory requirement is met is to be determined by the issuing judge in a common sense manner." *United States v. Maxwell,* 25 F. 3d 1389, 1394 (8th Cir. 1994). The wiretap law prohibits wiretapping when normal investigative techniques were likely to succeed and are not too dangerous.

12.      Normal investigative procedures would include, for example, standard visual or aural surveillance techniques by law enforcement officers; general questioning or interrogation of involving individuals under community grant; use of regular search warrants; the infiltration of conspiratorial groups by undercover agents and informants; and the use of grand juries.

3

13.     The government is "required to make a reasonable, good faith effort to run the gamut of normal investigative procedures" before wiretapping telephones. *United States v. Ashley,* 876 F. 2d 1069, 1072 (1st Cir. 1989).

14.     In this case, the application for the initial wiretap is insufficient to show necessity because, as shown by the affidavits tendered in support of the wiretap application, traditional investigative methods were working.

15.     The government's purpose in seeking the wiretaps was to discover the specifics of a cigarette trafficking organization (CTO) based in St. Louis, Missouri, including (1) the nature, extent, and methods of operation; the identity of the individuals involved; the location and sources of resources used to finance the CTO; and the location and disposition of the proceeds from those activities.

16.     Special Agent Matthew D. Hackman, DHS-HIS, detailed his findings identifying the leaders and the workings of the CTO in his affidavit submitted in conjunction with the initial application for interception of wire and electronic communications from **target telephone #6.**

17.     Using normal investigative techniques, Agent Hackman was able to identify twenty business organizations, with each business having a retail account with Sam's Club that authorized certain individuals to buy Missouri tax-stamped cigarettes for retail sales.

18.     The government's theory is that members of the CTO used the various business accounts to purchase vast amounts of Missouri tax-stamped cigarettes, a majority of which were subsequently sold out-of-state in violation of the Contraband Cigarette Trafficking Act, 18 U.S. C. § 2341-2346.

19.     As described in ¶ 37-40 of the affidavit, the government was able to discovery a specific pattern of alleged money laundering and structuring of the CTO's proceeds through the analysis

4

of Sam's point-of-sale records and the bank records of the identified businesses owned or organized by the Almuttan brothers.

20. The affidavit details a number of incidents involving the seizure of contraband cigarettes and/or large amounts of cash occurring in 2015 (¶¶ 39-43), and 2016 (¶¶ 44-52).

21. The analysis of Sam's point-of-sale records of Missouri tax-stamped cigarettes at or near the time of the seizures described in the affidavit is indicative of the workings of the CTO, including the purchase of large amounts of cigarettes in the days prior to the seizure; the use of multiple purchases to allegedly avoid the case reporting requirements; and the large cash deposits made into related business accounts in the days following the seizures. *See* Affidavit, ¶ 41.

22. Investigators reviewed a voluminous amount of bank records relative to the financial activities of the above-mentioned corporations, including copies of the annual federal and state tax filings for the corporations, and noticed "a substantial discrepancy in the 'gross receipts and cost of goods sold' declared to each of the government entities as well as a 'colossal variance' between the declared gross sales of the corporation, the value of corporate funds utilized to purchase Missouri taxed cigarettes from St. Louis Sam's, and the total amounts of money deposited into or from the bank accounts servicing each corporation." *See* Affidavit, ¶¶ 60.

23. On July 12, 2016, U.S. Magistrate Judge Nanette Baker signed a warrant and court order authorizing the installation and use of a PEN register and trap-and-trace devices, including enhanced caller identification, associated with cellular telephone number (314) 566-3565 (**target telephone #1**), and (314) 625-8401 (**target telephone #2**) utilized by Mohammed Almuttan and Sadam Mutan, respectively, authorizing the obtainment of record, location information, including precision location information, cell site information, and other signaling information.

5

As detailed in the affidavit, a plethora of potentially incriminating evidence was obtained through the PEN registers. *See* Affidavit, ¶¶ 56, 57, pp. 67-73.

24. The government's reasons for seeking the wiretap was to investigate money laundering and structuring activities related to a cigarette trafficking organization; however, as disclosed in the affidavit, sufficient information had already been confirmed through normal investigative techniques, indicating the structures and the working of the CTO, including money laundering of the alleged illegal proceeds; the identities and roles of principals, accomplices, and co-conspirators; and the distribution and transfer of contraband cigarettes and illegal money involved in those activities.

25. Agent Hackman's conclusionary statement to the contrary, normal investigative techniques were working, and his affidavit is insufficient to satisfy the necessity requirement. *See e.g. United States v. DiMuro,* 540 F. 2d 503, 510 (1st Cir. 1976) (agent's conclusionary statements that government investigative techniques would not work were insufficient).

26. Assuming for the sake of argument that the initial application and resulting wiretap order was a necessary intrusion, the extensions for **target telephone #1**, and the subsequent authorization and exceptions of wiretap order for **target telephone #1, 2 and 6** were clearly unnecessary and gratuitous because the government, by then, clearly had all the evidence that they needed to prosecute their case.

27. By extending and broadening the wiretaps to include additional telephone numbers, the government spurned traditional and effective investigative techniques for the easy and intrusive wiretaps.

28. The affidavit attached to the application for the extension of the wiretap for **target telephone #1** and those submitted for the initial and extension of the wiretap orders for **target**

6

**telephone #2, 3, and 4,** and facially insufficient as they, like the initial affidavit, fail to meet the necessity requirement.

WHEREFORE, for each and all of the foregoing reasons, defendant Hisham Mutan prays that the Court enter its order suppressing any and all evidence derived from and obtained as a result of the government's interception of wire communications.

BRUNTRAGER & BILLINGS, P.C.

/s/ Neil J. Bruntrager
Neil J. Bruntrager #29688
Attorney for Defendant2
225 S. Meramec Ave., Suite 1200
St. Louis, Missouri  63105
(314) 646-0066

/s/ Daniel J. Bruntrager
Daniel J. Bruntrager, #34546
225 S. Meramec Ave., Suite 1200.
St. Louis, Missouri  631105
(314) 646-0066
(314) 646-0065-facsimile

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of May 2019, I hereby certify that a copy of the foregoing **Motion to Suppress Any and All Intercepted Wire and Electronic Communications** was filed electronically to be served by operation of the Court's electronic filing system upon all attorneys of record.

/s/ Neil J. Bruntrager